1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

DARLIN GRAY,

                              Plaintiff,

        v.

TWITTER INC,

                              Defendant.

CASE NO. 2:20-cv-01389 RAJ-BAT

**REPORT AND
RECOMMENDATION**

Defendant Twitter Inc. ("Twitter") seeks dismissal of Plaintiff Darlin Gray's Class

Action Complaint. Dkt. 17. Plaintiff purports to bring this action individually and on behalf of

similarly situated Washington Twitter users and alleges Twitter procured their telephone

numbers by fraudulent, deceptive, or false representations, in violation of RCW 9.26A.140. Dkt.

1. Plaintiff opposes the motion or alternatively, requests leave to amend. Dkt. 19. Twitter's

motion should be granted as Plaintiff's claims fail as a matter of law.

BACKGROUND

A.    Plaintiff's Allegations

        Pursuant to Fed. R. Civ. P. 12(b)(6), the following allegations of fact contained in

Plaintiffs' Complaint (Dkt. 1) are assumed to be true for purposes of this motion:

        Plaintiff is a Twitter user with the username @darlingray. Twitter "procured" Plaintiff's

telephone record (specifically, her telephone number) by fraudulently, deceptively, or falsely

assuring Plaintiff that she could "designate the uses to which the telephone number was put,

REPORT AND RECOMMENDATION - 1

thereby maintaining control over the use of the telephone number by Twitter, through functions made available on Twitter's user-facing systems." Dkt. 1, Compl., ¶¶ 36, 37, 38, 39. Plaintiff relied on these assurances when she provided her telephone number to Twitter. Dkt. 1, ¶¶ 42. Similarly, other Washington users relied on these assurances when they gave their telephone numbers to Twitter. *Id.*, ¶¶ 40, 50.

Twitter provided Plaintiff and other Washington users various screens for account management that purported to give them the ability to control how Twitter used their telephone numbers. *Id.*, ¶ 51. However, Twitter failed to honor the privacy choices exercised by users. *Id.*, ¶ 52. Twitter concealed this wrongdoing until October 8, 2019, when Twitter publicly acknowledged that "when [users] provided an email address or phone number for safety or security purposes (for example, two-factor authentication) this data may have inadvertently been used for advertising purposes, specifically in our Tailored Audiences and Partner Audiences advertising system." *Id.*, 54, 55.

Twitter did not create, implement, or execute systems that honored users' designations as to use of their telephone numbers. Instead, Twitter increased its revenue, by increasing the price of its advertising. *Id.*, ¶¶ 60, 61, 62.

Based on the foregoing, Plaintiff alleges that Twitter is subject to legal action for injunctive relief and actual damages, including mental pain and suffering, or liquidated damages of five thousand dollars per violation, whichever is greater, pursuant to RCW 9A.26.140, and that each telephone number Twitter obtained from a Washington person constitutes a separate violation of RCW 9A.261.40. Plaintiff further alleges injury to her person, business, or property by Twitter's acts that are part of a pattern of acts included in RCW 9A.82.010(4)(nn). *Id.*, ¶¶ 66-70.

REPORT AND RECOMMENDATION - 2

Plaintiff's assertions that Twitter is a telecommunications company as defined in RCW 80.04.010(27) and RCW 9.26A.100; and that telephone numbers are "telephone records" as defined in RCW 9.26A.140, are not construed as true for purposes of this motion as these are legal conclusions which the Court need not accept as true. *See Iceberg v. Martin*, No. C15-1232JLR, 2017 WL 396438, at *4 (W.D. Wash. Jan. 30, 2017).

B.      Twitter's October 8, 2019 Announcement

Twitter's October 8, 2019 announcement is quoted in Plaintiff's Complaint. Dkt. 1, ¶ 55. Thus, the Court may consider this document on a motion to dismiss under the doctrine of incorporation by reference. *Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005).[1] The Announcement is set forth in full, as follows:

> We recently discovered that when you provided an email address or phone number for safety or security purposes (for example, two-factor authentication) this data may have inadvertently been used for advertising purposes, specifically in our Tailored Audiences and Partner Audiences advertising system.
>
> Tailored Audiences is a version of an industry-standard product that allows advertisers to target ads to customers based on the advertiser's own marketing lists (e.g., email address or phone numbers they have compiled). Partner Audiences allows advertisers to use the same Tailored Audiences features to target ads to audiences provided by third-party partners. When an advertiser uploaded their marketing list, we may have matched people on Twitter to their list based on the email or phone number the Twitter account holder provided for safety and security purposes. This was an error and we apologize.
>
> We cannot say with certainly how many people were impacted by this, but in an effort to be transparent, we wanted to make everyone aware. No personal data was ever shared externally with our partners or any other third parties. As of September 17, we have addressed the issue that allowed this to occur and are no longer using phone numbers or email addresses collected for safety or security purposes for advertising.

---

[1] "Documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the [plaintiff's] pleading" may be considered under the doctrine of incorporation by reference." *Knievel*, 393 F.3d at 1076 (internal quotation marks and citation omitted) (alteration in original).

REPORT AND RECOMMENDATION - 3

> We're very sorry this happened and are taking steps to make sure we don't make a mistake like this again. If you have any questions, you may contact Twitter's Office of Data Protection through this form.

Dkt. 18, Declaration of Aravind Swaminathan ("Swaminathan Decl."), Ex. A.

Twitter's registration process references Twitter's Privacy Policy, which discloses that "Twitter also uses your contact information to market to you as your country's laws allow." Dkt. 18, Swaminathan Decl. Ex. B, available at https://twitter.com/en/privacy/previous/version_14. The Court may consider Twitter's registration portal, related webpages, and statements made therein because Plaintiff's claim expressly relies on Twitter's "assurances" made at the time Plaintiff provided her telephone number to Twitter and on the contents of Twitter's "user-facing systems" and "various screens purportedly for account management." Dkt. 1, ¶¶ 39-40, 42, 51; *see Garcia v. Enter. Holdings, Inc.*, 78 F. Supp. 3d 1125, 1136–37 (N.D. Cal. 2015);[2] *see also Knievel*, 393 F.3d at 1076.

The two programs referred to in the October 8, 2019 announcement—Twitter's Tailored Audiences program and its Tailored Partner program—allow advertisers to "target [their] existing followers and customers to create relevant re-marketing campaigns by uploading [their] own CRM lists" (such as lists of e-mail addresses). Dkt. 18, Swaminathan Decl. Ex. C.[3] Twitter

---

[2] In *Garcia*, the Court rejected the plaintiff's contention that the Court could not consider defendant's privacy policy because his claim did not depend on its contents. The Court held, "[p]laintiff alleges that he signed up to use Zimride but never consented to the disclosure of his personal information. But to use Zimride, Plaintiff necessarily had to agree with Zimride's TOS and Privacy Policy, which clearly state that such information may, in fact, be disclosed. Because Plaintiff's claim necessarily depends on the application of Zimride's policies—which relate directly to the issue of consent—the Court finds that these documents may appropriately be considered on a motion to dismiss."

[3] Available at https://business.twitter.com/en/help/campaign-setup/campaign-targeting/custom-audiences.html. Language quoted in Paragraph 55 of the Complaint—"Tailored Audiences"—contains a hyperlink to this website. Thus, the Court may consider this document on a motion to dismiss. *See, e.g., Shrem v. Southwest Airlines Co.*, No. 15-CV-04567-HSG, 2016 WL 4170462,

then internally matches the contact information provided in the advertiser's list to Twitter @handles and displays the advertisement accordingly, with no external disclosure as part of the process. *See id.* ("our systems will then match the users to their Twitter @handles"); Dkt. 18, Swaminathan Decl., Ex. A ("we may have matched people on Twitter to their list based on the email or phone number"). Twitter's October 8, 2019 announcement confirmed this, stating that "[n]o personal data was ever shared externally with our partners or any other third parties" in the course of Twitter's possible inadvertent use of certain user email addresses and telephone numbers. Dkt. 18, Swaminathan Decl. Ex. A.

C.      <u>RCW 9.26A.140 Unauthorized Sale or Procurement of Telephone Records</u>

        Plaintiff asserts claims under Section 140(1)(a) and Section 140(1)(b). Under these sections,

> (1) A person is guilty of the unauthorized sale or procurement of telephone records if the person:
>
> (a) Intentionally sells the telephone record of any resident of this state without the authorization of the customer to whom the record pertains;
>
> (b) By fraudulent, deceptive, or false means obtains the telephone record of any resident of this state to whom the record pertains;
>
> (c) Knowingly purchases the telephone record of any resident of this state without the authorization of the customer to whom the record pertains; or
>
> (d) Knowingly receives the telephone record of any resident of this state without the authorization of the customer to whom the record pertains.
>
> (2) This section does not apply to:
>
> (a) Any action by a government agency, or any officer, employee, or agent of such agency, to obtain telephone records in connection with the performance of the official duties of the agency;

at *2 (N.D. Cal. Aug. 8, 2016) (where e-ticket attached as an exhibit to the complaint referenced defendant's terms and policies through hyperlinks on the page).

(b) A telecommunications company that obtains, uses, discloses, or permits access to any telephone record, either directly or indirectly through its agents, that is:

(i) With the lawful consent of the customer or subscriber;

(ii) Authorized by law;

(iii) Necessarily incident to the rendition of the service or to the protection of the rights or property of the provider of that service, or to protect users of those services and other carriers from fraudulent, abusive, or unlawful use of, or subscription to, such services; or

(iv) In connection with the sale or transfer of all or part of its business, or the purchase or acquisition of a portion or all of a business, or the migration of a customer from one carrier to another.

(3) A violation of subsection (1)(a), (b), or (c) of this section is a class C felony. A violation of subsection (1)(d) of this section is a gross misdemeanor.

(4) A person who violates this section is subject to legal action for injunctive relief and either actual damages, including mental pain and suffering, or liquidated damages of five thousand dollars per violation, whichever is greater. Reasonable attorneys' fees and other costs of litigation are also recoverable.

(5) The definitions in this subsection apply throughout this section unless the context clearly requires otherwise.

(a) "Telecommunications company" has the meaning provided in RCW 9.26A.100 and includes "radio communications service companies" as defined in RCW 80.04.010.[4]

(b) "Telephone record" means information retained by a telecommunications company that relates to the telephone number dialed by the customer or the incoming number or call directed to a customer, or other data related to such calls typically contained on a customer telephone bill such as the time the call started and ended, the duration of the call, the time of day the call was made, and any charges applied. "Telephone record" does not include any information collected and retained by customers using caller identification or other similar technologies.

(c) "Procure" means to obtain by any means, whether electronically, in writing, or in oral form, with or without consideration.

---

[4] RCW 80.04.010 defines a "telecommunications company" as a company "owning, operating or managing any facilities used to provide telecommunications for hire, sale, or resale to the general public within this state." RCW 80.04.010(28).

REPORT AND RECOMMENDATION - 6

RCW 9.26A.140.

The Washington Legislature passed Section 140 in 2006 to combat a practice known as "pretexting," observing that there were no laws prohibiting the practice with respect to telephone records. Dkt. 18, Swaminathan Decl. Ex. D (Washington House Bill Report, 2006 Reg. Sess. S.B. 6776). The Legislature defined "pretexting" as the practice of obtaining an individual's personal information under false pretenses, which may include cracking on-line accounts and impersonating customers. *See id.*; see also Press Release, Federal Trade Commission, As Part of "Operation Detect Pretext" FTC Sues to Halt "Pretexting" (April 18, 2001), https://www.ftc.gov/ news-events/ press-releases/2001/04/ part-operation-detectpretext-ftc-sues-halt-pretexting. Dkt. 18, Swaminathan Decl.. Ex. E.[5] The Legislature also noted that, according to the Electronic Privacy Information Center, in July of 2005 there were over 40 websites selling telephone calling records and other confidential information, and the FCC was investigating several companies that appeared to be engaged in telephone pretexting.

The Legislature described the information typically obtained via pretexting as "data collected by a telecommunications company about a consumer's telephone calls" which "may include the time, date, duration and destination number of each call, as well as information about any subscribed services." *Id.* (referred to as "Customer Proprietary Network Information" or "CPNI").

Around the same time, the Federal Trade Commission ("FTC") filed several complaints under Section 5(a) of the FTC Act against companies advertising that they could procure confidential customer phone records from telecommunications carriers and make such

---

[5] The Court takes judicial notice of these documents, without converting the motion into a motion for summary judgment. *See In re Copper Mountain Sec. Litig.*, 311 F. Supp. 2d 857, 863–64 (N.D. Cal. 2004) (judicial notice of SEC filings and publicly available press releases allowed).

REPORT AND RECOMMENDATION - 7

information available for a fee. *See Internet Data Brokers: Who Has Access to Your Private Records?; Hearings Before the Subcomm. on Oversight and Investigations and the H. Comm. On Energy and Commerce, 109th Cong. 1285-1296 (2006);*[6] *see also Combating Pretexting: Prevention of Fraudulent Access to Phone Records Act: Hearing on H.R. 936 Before the H. Comm. On Energy and Commerce, 110th Cong. 34-44 (2007).*[7] ("The complaints alleged that the defendants, or persons they hired, obtained this information by using false pretenses, including posing as the carrier's customer, to induce the carrier's employees to disclose the records.").

Washington was among several states to enact criminal statutes to specifically prohibit pretexting. Dkt. 18, Swaminathan Decl. Ex. D (Washington House Bill Report, 2006 Reg. Sess. S.B. 6776) ("This bill has been introduced as model legislation in several states."); *see, e.g.*, Cal. Penal Code § 638 (prohibiting procurement of "telephone calling pattern record or list," defined as "information retained by a telephone company that relates to the telephone number dialed by the subscriber…" through fraud or deceit); N.Y. Gen. Bus. Law §399-dd (prohibiting intentional procurement of "telephone record information from a telephone company"); 18 U.S.C.§ 1039 (making it a criminal violation to "knowingly and intentionally obtain[], or attempts to obtain, confidential phone records information of a covered entity").

## DISCUSSION

A.    <u>Legal Standard – Rule 12(b)(6)</u>

In making a 12(b)(6) assessment, the court accepts all facts alleged in the complaint as true and makes all inferences in the light most favorable to the non-moving party. *Baker v.*

---

[6] Available at https://www.congress.gov/109/chrg/CHRG-109hhrg31363/CHRG-109hhrg31363.pdf; *See also*, Dkt. 18, Swaminathan Decl. Ex. F.

[7] Available at https://www.congress.gov/110/chrg/CHRG-110hhrg39361/CHRG-110hhrg39361.pdf; *See also*, Dkt. 18, Swaminathan Decl. Ex. G.

REPORT AND RECOMMENDATION - 8

1   *Riverside County Office of Educ.*, 584 F.3d 821, 824 (9th Cir. 2009) (internal citations omitted).

2   However, the court is not required to accept as true a "legal conclusion couched as a factual

3   allegation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009)

4   (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929

5   (2007)). The complaint "must contain sufficient factual matter, accepted as true, to state a claim

6   to relief that is plausible on its face." *Id*. at 678, 129 S.Ct. 1937. This requirement is met when

7   the plaintiff "pleads factual content that allows the court to draw the reasonable inference that the

8   defendant is liable for the misconduct alleged." *Id*. The complaint need not include detailed

9   allegations, but it must have "more than labels and conclusions, and a formulaic recitation of the

10  elements of a cause of action will not do." *Twombly*, 550 U.S. at 555, 127 S.Ct. 1955. Absent

11  facial plausibility, a plaintiff's claims must be dismissed. *Id*. at 570, 127 S.Ct. 1955.

12          Twitter contends that Plaintiff's Complaint must be dismissed because her Section 140

13  claims fail as a matter of law and fail to satisfy relevant pleading standards.

14  B.      Plaintiff's Claims Fail as a Matter of Law

15          1.      Section 140(1)(a)

16          Section 140(1)(a) prohibits the intentional sale of the telephone record of any resident of

17  this state without the authorization of the customer to whom the record pertains. Setting aside for

18  a moment, the question of whether Plaintiff's telephone number falls within the statutory

19  definition of "telephone record," which is discussed below, the Court concludes that Plaintiff's

20  Section 140(1)(a) claim should be dismissed because Plaintiff fails to allege any facts to support

21  her conclusory assertion that Twitter "intentionally sold [her] her telephone records."

22          Rather, Plaintiff points to Twitter's October 8, 2019 statement that email addresses and

23  telephone numbers submitted by Twitter users for safety or security purposes may have

1    *inadvertently* been used for advertising purposes, specifically in Twitter's Tailored Audiences

2    and Tailored Partner program. However, that same announcement also stated that "no personal

3    data was ever shared externally with [Twitter's' partners or any other third party," and that the

4    error was addressed on September 17, 2019. Dkt. 18, Swaminathan Decl., Ex. A.[8]

5            Additionally, the Tailored Audiences and Tailored Partner program webpages

6    (incorporated by reference) show that telephone numbers are not provided to advertisers;

7    advertisers provide their own customer lists to Twitter and Twitter uses those lists to distribute

8    the advertisements. Dkt. 18, Swaminathan Decl. Ex. C. Plaintiff does not explain how Twitter's

9    inadvertent use of telephone numbers should give rise to a reasonable inference of an intentional

10   sale of telephone numbers, when the telephone numbers are not given to advertisers. *See id*.

11           Relying on *Nayab v. Capital One Bank (USA), N.A*., 942 F.3d 480, 493-94 (9th Cir.

12   2019), Plaintiff argues that she need not allege facts showing an intentional sale because they are

13   peculiarly within Twitter's knowledge. However, *Nayab* merely clarifies that Rule 9(b)'s

14   particularity requirements—under which "information and belief" allegations are

15   insufficient—are relaxed as to matters peculiarly within the opposing party's knowledge. *See*

16   *id*. (internal citation omitted). Plaintiff must still allege a "facts upon which the belief

17   is founded" sufficient to satisfy Rule 8. *See id*. at 494-96. Plaintiff has alleged no such facts.

18           Plaintiff also argues that "[b]y giving advertisers some degree of unauthorized access to

19   telephone records in exchange for money, Twitter sold those records without authorization." Dkt.

20   19, p. 24. However, this theory is not alleged in the Complaint nor are there any facts alleged

21

22

23   [8] 9 *See City of Roseville Emps.' Ret. Sys. v. Sterling Fin. Corp*., 963 F. Supp. 2d 1092, 1107 (E.D.
     Wash. 2013) ("Once a document is deemed incorporated by reference, the entire document is
     assumed to be true for purposes of a motion to dismiss, and both parties—and the Court—are
     free to refer to any of its contents.").

REPORT AND RECOMMENDATION - 10

from which this conclusion may reasonably be inferred. Plaintiff further alleges that discovery will "reveal whether" Twitter disclosed numbers to advertisers. Dkt. 1, ¶ 6. However, discovery is not for finding the facts needed to state a claim. *See Seattle Powersports LLC v. Harley-Davidson Motor Co. Inc*., No. 2:19-cv-01339 RSL-BAT, 2019 WL 7878588, at *11 (W.D. Wash. Oct. 25, 2019), Report and Recommendation adopted, 2020 WL 606686 (W.D. Wash. Feb. 7, 2020) ("While a party may need additional discovery to flesh out the details and obtain evidence of a disputed factual allegation, discovery is not for finding the facts needed to state a claim."); *see also Inst. For Wildlife Prot. v. Norton*, 337 F. Supp. 2d 1223, 1226 (W.D. Wash. 2004) ("To maintain an action in federal court, an actual case or controversy must exist, and discovery may not be used to conduct a fishing expedition in hopes that some fact supporting an allegation will be uncovered.")

Because Plaintiff has not alleged facts showing that Twitter "intentionally sold" her telephone number, it is recommended that Plaintiff's Section 140(1)(a) claim be dismissed. As discussed further below, this claim also fails as a matter of law because Section 140 does not cover the facts alleged.

2.    <u>Section 140(1)(b)</u>

Section 140(1)(b) prohibits the use of fraudulent, deceptive, or false means to "obtain[] the telephone record of any resident." RCW 9.26A.140(1)(b). The issues here are whether Twitter is a telecommunications company, as defined in Section 140, and whether Plaintiff's telephone number falls within the statutory definition of "telephone record." Assuming both questions are answered in the affirmative, the issue becomes whether Plaintiff's Section 140(b) allegations satisfy the pleading requirements of Rule 9(b).

a.      "Telecommunications Company"

A "telecommunications company" is defined in Section 140(b) by reference to RCW 80.04.010, which defines the term as any company (or other form of entity) "owning, operating or managing any facilities used to provide telecommunications for hire, sale, or resale to the general public within this state." RCW 80.04.010(28). Plaintiff alleges that Twitter is a telecommunications company because it accepts money from eligible advertisers to advertise on Twitter's website. Dkt. 1, ¶ 28.

The Court is aware that Twitter is a global social media networking platform, which gives people a vehicle to express themselves online in short soundbites called "tweets" that are limited to 140 characters. *Nunes v. Twitter, Inc.*, 194 F.Supp.3d 959, 960 (N.D. Cal.2016). According to its Account Eligibility Statement, Twitter generates revenue through advertising sales, does not require users to pay for its services, and its users are subject to eligibility restrictions. Dkt. 18, Swaminathan Decl., Ex. H. *See also*, *Shenwick v. Twitter, Inc.*, 282 F.Supp.3d 1115, 1121 (N.D. Cal. Oct. 16, 2017) ("Twitter is a social media company that, like other social media companies, depends on advertising revenue. Accordingly, how many users Twitter has, and whether those users are engaged with Twitter's content, are deeply important to its success as a company."); *Fields v. Twitter, Inc.*, 200 F.Supp.3d 964, 969 (N.D. Cal. 2016) ("Twitter is an interactive computer service provider.") Thus, Twitter provides advertising "for hire, sale, or resale" – not telecommunications.

There is nothing in the Complaint (or in documents attached to the complaint, documents relied upon but not attached to the complaint whose authenticity is not contested, and matters of which the court takes judicial notice) from which the Court may reasonably conclude that Twitter is a telecommunications company, *i.e.*, a company that owns, operates, or manages

facilities used to provide telecommunications for hire, sale, or resale to the general public. *See* RCW 80.04.010(28).

b.   "Telephone Record"

A "telephone record" is statutorily defined as "information *retained by* a *telecommunications company* that relates to the telephone number *dialed by* the customer or the incoming number or call *directed to* a customer, or *other data related to such calls* typically contained on a customer telephone bill *such as* the time the call started and ended, the duration of the call, the time of day the call was made, and any charges applied." RCW 9.26A.140(5)(b).

Plaintiff contends that her telephone number is part of the "telephone record" defined in Section 140. However, Plaintiff acknowledges that while the initial draft of the bill would have barred sales of any "telephone number or call record," that language was not enacted into law. Dkt. 19, p. 20[9] (quoting Dkt. 20, Declaration of Joel B. Ard, Ex. B). A substitute bill eliminated the prohibition on selling any "telephone number," and rewrote the bar to apply only to "telephone record[s]." *See id.*, Ard. Decl. Ex. C; *cf.* SB Bill 6776 Digest (including "telephone number") and SB 6776-S.E. Digest (as enacted) (deleting reference to "telephone number").[10] *See also*, ESSB 6776, as passed in the House on March 1, 2006, defining Customer Proprietary Network Information ("CPNI") as "data collected by a telecommunications company about a consumer's telephone calls." *Id.*, Ex. D.

Because the Legislature eliminated the reference to "telephone number," this indicates an intent not to include a customer's telephone number. *See State v. Hirschfelder*, 170 Wn.2d 536, 546-47 (2010) (substitute bill's elimination of item from initial bill indicates intent not to include

---

[9] In citing to the parties' briefs, the Court has used CM/ECF pagination.

[10] Legislative history documents related to 2006 ESSB 6776 are available at https://app.leg.wa.gov/billsummary? BillNumber=6776&Year=2005&Initiative=false.

that item). If the Legislature meant for a customer's telephone number to be included in the definition of "telephone record" or CPNI, it could have said so, as it did in earlier versions of the bill. *See Jennings v. Rodriguez*, 138 S. Ct. 830, 844 (2018) ("The expression of one thing implies the exclusion of others[.]"); *see also*, *Rest. Dev., Inc. v. Cananwill, Inc*., 150 Wn.2d 674, 682 (2003) ("[A] court must not add words where the legislature has chosen not to include them.").

Section 140 further defines "telephone record" as "information *retained* by a telecommunications company." Plaintiff suggests that this language should be read as protecting a customer's telephone record regardless of its current location or provenance; particularly due to its intangible nature. Dkt. 19, pp. 12. There is no support for such an interpretation. In addition, the Washington Supreme Court has no difficulty determining whether information is "retained by" an entity regardless of whether the information can be reproduced *ad infinitum. See Nissen v. Pierce Cty*., 183 Wn.2d 863, 882-83 (2015) (holding that certain call "logs… [we]re not public records" because they were "retained by Verizon," not a public agency, without looking to whether the records were of a type also held by the government).[11]

Plaintiff further argues that a "customer's own telephone number" qualifies as a "telephone record" because it (1) is "'related to' the information retained by a telecommunications company" and (2) is "part of the data that is 'typically contained on a customer telephone bill.'" Dkt. 19, p. 18. This interpretation ignores the clear language of the statute. First, the statute does not say a "telephone record" is anything "'related to' the information retained by a telecommunications company." Rather, it states that such a record is "information retained by a telecommunications company that relates to" one of the enumerated

---

[11] *See also*, Merriam-Webster, retain, https://www.merriam-webster.com/dictionary/retain (last visited Mar. 16, 2021) (defining "retain" as "to keep in possession").

REPORT AND RECOMMENDATION - 14

1   topics, all of which concern the customer's call history. RCW 9.26A.140(5)(b). Second, the

2   statute does not say a "telephone record" includes any data "typically contained on a customer

3   telephone bill." Rather, it encompasses data "typically contained on a customer telephone bill"

4   only if it also "relate[s] to" the "call[s] directed to [the] customer." The relevant language is "or

5   other data related to *such calls* typically contained on a customer telephone bill." The "such

6   calls" in this context refers to "call[s] directed to a customer"—the only "calls" mentioned in the

7   provision. RCW 9.26A.140(5)(b). Thus, the statute requires both that (1) the information be

8   "retained by a telecommunications company" and (2) the information "relates to various

9   categories of information (*i.e.*, "the telephone number dialed by the customer," the "incoming

10  number" on a call to the customer, and "other data related to such calls typically contained on a

11  customer telephone bill") which is information typically retained by a telecommunications

12  company.

13          Next, Plaintiff argues that, if telephone numbers do not fall within the definition of

14  "telephone record," there would be no need for the second sentence of Section 140(2)(5)(b),

15  which excludes "any information collected and retained by customers using caller identification

16  or other similar technologies." However, as Plaintiff acknowledges, "Caller ID[12] collects other

17  people's telephone numbers[,]" not a customer's own telephone number. Dkt. 19, p. 19, n.6.

18  Moreover, this carve out of liability as to Caller ID makes sense. Section 140 imposes liability

19  whenever a person (i) receives information (ii) retained by a telecommunications company (iii)

20  that relates to certain categories of data (iv) without consent. Caller ID does the very thing

21  prohibited by the statute: (i) receives information (ii) from a telephone company (iii) about

22

23  [12] *See Bell Atl. Corp. v. AT&T*, 339 F.3d 294, 297 (5th Cir. 2003) ("[C]aller ID is a service
    marketed and provided by local telephone companies that permits the display…of the telephone
    number … of the calling party.").

REPORT AND RECOMMENDATION - 15

another person's telephone behavior (the incoming number, call time, duration, place of origination, and name of the dialer) (iv) without that person's permission. Thus, the Caller ID exemption, far from being meaningless, is instead the only way the statute prevents that commonplace technology from triggering criminal liability.

Plaintiff also suggests that Section 140(1)(a) was not intended to target telecommunications companies only. However, the statute appears to have intended just that. Specifically, Section 140(2)(b) exempts a "telecommunications company" from liability for selling a telephone record in certain, limited circumstances (*e.g.*, "[i]n connection with the sale or transfer of all or part of its business"). No other types of entities are exempted or mentioned. If the Legislature envisioned that bar applying to other entities, it would be odd not to extend them the same exemption. Plaintiff insists that if the Legislature had meant for Section 140(1)(a) to target telecommunications companies, it would have said so explicitly, instead of barring a "person" from selling telephone records. Dkt. 19, p. 15. But selling records is not the only act Section 140(1) forbids a "person" to do; it also bars buying, receiving, and procuring them. Because most of those acts can be committed by anyone, it makes sense the Legislature used the broader term "person" to introduce that list. For example, RCW 18.04.370(a) makes it a crime for "any person" to violate various accounting statutes, even though some can be violated only by accounting "firm[s]." *See* RCW 18.04.345(3), (4), (6); RCW 18.04.025(8) (defining "firm" to exclude natural persons).

Notwithstanding the foregoing, if the statute's plain language and legislative history leave any uncertainty as to the proper interpretation of the words, "telecommunications" or "telephone record," the rule of lenity weighs in favor of resolving those doubts in Twitter's favor. "It is well established that 'ambiguity concerning the ambit of criminal statutes should be resolved in favor

of lenity.'" *United States v. Carr*, 513 F.3d 1164, 1168 (9th Cir.2008) (citation omitted). The rule is equally relevant in the civil context if the statute at issue is also criminal. *LVRC Holdings LLC v. Brekka*, 581 F.3d 1127, 1134 (9th Cir.2009). Section 140 itself—which is codified under the "Crimes and Punishments" Title of the Revised Code of Washington—is a primarily criminal statute, which carries criminal penalties. *See* RCW 9.26A.140(3) ("A violation of subsection (1)(a), (b), or (c) of this section is a class C felony."). The rule of lenity therefore applies to it with full force, even in a civil case. *See Joffe v. Google, Inc*., 746 F.3d 920, 935 (9th Cir. 2013) (observing that the rule of lenity could apply in interpreting the Wiretap Act in a civil case, because the Wiretap Act carries criminal penalties); *Leocal v. Ashcroft*, 543 U.S. 1, 11 n.8, 125 S. Ct. 377, 160 L. Ed. 2d 271 (2004) ("Because we must interpret the statute consistently, whether we encounter its application in a criminal or noncriminal context, the rule of lenity applies.").

When statutes have criminal consequences, the average person must be able to read the statute and understand what is, and what is not, prohibited. *See Liparota v. United States*, 471 U.S. 419, 427, 105 S. Ct. 2084, 2089, 85 L. Ed. 2d 434 (1985) ("[a]pplication of the rule of lenity ensures that criminal statutes will provide fair warning concerning conduct rendered illegal").

Because a "customer's telephone number" is not expressly included in the definition of "telephone record," under the rule of lenity, it is not a telephone record. *See United States v. Nosal*, 676 F.3d 854, 863 (9th Cir. 2012) (holding rule of lenity "ensures that citizens will have fair notice of the criminal laws" and thus "[i]f there is any doubt about whether Congress intended [the CFAA] to prohibit the conduct in which [Nosal] engaged, then we must choose the interpretation least likely to impose penalties unintended by Congress") (citation omitted).

1    Based on the foregoing, the Court concludes that Plaintiff has failed to state a claim for

2    violation of RCW 9.26.140(1)(a) or 9.26.140(1)(b) and therefore, the Complaint should be

3    dismissed.

4    Even if the Court assumes that Plaintiff's Section 140's claims do not fail as a matter of

5    law, the Complaint is nevertheless subject to dismissal as Plaintiff has failed to state a plausible

6    claim or plead her claim with sufficient particularity, as required by Fed. R. Civ. P. 8 and 9.

7    C.    Sufficiency of Pleading

8          1.    Rule 8 – Facial Plausibility

9    Plausibility requires concrete factual allegations, as opposed to conclusory assertions,

10   sufficient "to raise a right to relief above the speculative level." *See Somers v. Apple, Inc.*, 729

11   F.3d 953, 959–60 (9th Cir. 2013) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555

12   (2007)). The Complaint's allegations are plainly insufficient.

13   As to Plaintiff's allegations that Twitter "intentionally" sold her telephone number, the

14   Court has already concluded that Plaintiff's allegations are insufficient to state a claim under

15   Rule 8. *See* Paragraph B.1 above.

16   As to the Complaint's remaining allegations, Plaintiff fails to allege facts sufficient to

17   show that she suffered an injury. For example, Plaintiff does not allege that she provided her

18   telephone number to Twitter prior to September 17, 2019 (the date on which the October 8, 2019

19   announcement indicates the inadvertent use of phone numbers was corrected). Thus, there are no

20   facts asserted from which it may be inferred that Plaintiff's telephone number was part of the

21   disclosed inadvertent use. Plaintiff argues that the Court may infer she gave her telephone

22   number to Twitter sometime prior to October 8, 2019 from her proposed class definition and her

23   allegation that her claims are "typical" of the putative class. But these allegations do not include

REPORT AND RECOMMENDATION - 18

1   facts regarding Plaintiff's own claims, and whether her claims are "typical" of the putative class

2   for Rule 23 purposes is a legal conclusion not presumed to be true.

3         Next, although Plaintiff alleges she provided her telephone number to Twitter in reliance

4   on assurances made by Twitter that she would maintain control of the uses to which her

5   telephone number could be put, Plaintiff fails to allege the content and location of such

6   assurances and when she viewed those assurances. Citing to a Washington Consumer Protection

7   Act case, Plaintiff argues she need not allege when she viewed such assurances because reliance

8   is not an element of her claim. This makes no sense as the Complaint plainly pleads reliance

9   as part of Plaintiff's Section 140(1)(b) claim. See Dkt. 1, ¶¶ 48-49 (alleging persons provided

10  telephone numbers to Twitter, and "*did so in reliance* on Twitter's fraudulent, deceptive, or

11  false means" (emphasis added)). If the causation theory being pled is reliance, then reliance must

12  be shown. This is true for CPA cases as well. *See Young*, 196 Wn.2d at 322 ("But Young's own

13  causation theory as pleaded in this particular case was reliance ... The trial judge did not hold

14  him to the reliance standard. Reliance was Young's theory and he failed to prove it.").

15        Last, Plaintiff claims she need not allege what use designations she made for her

16  telephone number, because the CPA does not require her to show actual deception. Here again,

17  Plaintiff is not asserting a CPA claim. Moreover, the October 8, 2019 announcement disclosed

18  that numbers provided "for safety and security purposes" were inadvertently used for the

19  Tailored Audiences program. Dkt. 18, Swaminathan Decl. Ex. A. If Plaintiff provided her

20  telephone number for a different purpose, or selected designations that allowed use of her phone

21  number for the Tailored Audiences program, then the announcement itself does not show she

22  suffered an injury.

23

1   In sum, Plaintiff's Complaint fails to plead factual content that would allow the Court to

2   draw the reasonable inference that the defendant is liable for the misconduct alleged.

3        2.    <u>Rule 9 – Pleading Fraud</u>

4   In addition to the facial plausibility requirement of Fed. R. Civ. P. 8, Twitter contends

5   that the heightened pleading requirement of Fed. R. Civ. P. 9(b) applies to Plaintiff's allegations.

6   Plaintiff argues that Section 140(1)(b), criminalizes "fraudulent, deceptive, *or* false means[,]"

7   thus, creating liability for *either* (a) deceptive means or (b) fraudulent ones. *Id.* Because she

8   alleges that Twitter obtained her telephone number by *deceptive* means, she argues that the

9   Complaint does not allege fraud and Rule 9 does not apply. This is incorrect for two reasons.

10  First, because Section 140 is a criminal statute and second, because Plaintiff's allegations "sound

11  in fraud."

12  Section 140 is a criminal statute and only where "the language of the statute and any

13  legislative history" establish the Legislature meant to take the unusual step of eliminating the

14  "conventional *mens rea* element," will a criminal statute be interpreted to impose liability for

15  unknowing acts. *State v. Anderson*, 141 Wn.2d 357, 359, 360 (2000) (reading statute

16  criminalizing "possession" of a firearm to require "knowing possession"). There is no indication

17  here that the Legislature meant eliminate the *mens rea* element of any portion of the criminalized

18  conduct set forth in Section 140(1)(b).

19  Moreover, Plaintiff's allegations "sound in fraud" and therefore, must be averred with

20  particularity. Rule 9(b) applies to all claims "grounded in fraud" or which "sound in fraud." *Vess*

21  *v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1103–04 (9th Cir. 2003). That includes not only

22  "claims in which fraud is an essential element," *see, e.g.*, *S.E.C. v. Sandifur*, No. C05-1631C,

23  2006 WL 538210, at *3 (W.D. Wash. Mar. 2, 2006), but also those that "allege a unified course

of fraudulent conduct and rely entirely on that course of conduct as the basis of a claim." *Vess*, 317 F.3d at 1103-04; *see also Nemykina v. Old Navy, LLC*, 461 F. Supp. 3d 1054, 1058 (W.D. Wash. 2020) (finding claim under Washington's CPA premised on allegedly deceptive marketing was subject to Rule 9(b) pleading standard because it alleged a "unified course of fraudulent conduct").

The central theory of Plaintiff's Complaint is that Twitter "falsely assured" users it would honor their privacy choices to induce them to hand over their telephone numbers, which Twitter then used for advertising purposes in conscious disregard of users' privacy settings, all to increase its advertising revenue. Dkt. 1, ¶¶ 37-40, 44-47, 52, 58-62; *see also* Dkt. 19, pp. 23-24. Plaintiff further alleges "Twitter concealed its wrongdoing until October 8, 2019." Dkt. 1, ¶ 54.

Thus, Plaintiff is not merely claiming that Twitter engaged in conduct which had a capacity to deceive (which presumably would not require pleading with heightened specificity); but that Twitter had the knowledge and intent to deceive its customers to "induce them to hand over their telephone numbers" and concealed that deception to increase its advertising revenue. Thus, Rule 9 applies, which requires Plaintiff to plead her claims with heightened specificity, *i.e.*, "the who, what, when, where, and how" of the misconduct charged. *See Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1124 (9th Cir.2009).

The alleged "assurances" upon which Plaintiff and other Washington users allegedly relied appear nowhere in the Complaint. Plaintiff also fails to identify the location of the "various screens," of if it alleged that the "various screens" constituted the alleged "assurances," when and how she viewed such screens. *See, e.g.*, *ICT Law PLLC v. SeaTree PLLC*, No. C17-1681 TSZ, 2018 WL 4951942, at *4 (W.D. Wash. Oct. 12, 2018) ("Plaintiff refers to a series of statements as being false, but does not sufficiently describe the contents of those statements or

1   allege why those statements are not literally, technically, or legally true."); *See also*, *Gross v.*

2   *Symantec Corp.*, No. C 12-00154 CRB, 2012 WL 3116158, at *5 (N.D. Cal. July 31, 2012)

3   ("[w]ithout direct quotations from the PC Tools website or other marketing materials, the Court

4   cannot determine exactly how Symantec advertised its products" which was "critical to the fraud

5   analysis"); *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1125–26 (9th Cir. 2009) (plaintiff's

6   allegations regarding representations made in Ford's televised national marketing campaign,

7   sales materials, and by sales personnel failed to satisfy Rule 9(b) because plaintiff did not

8   "specify when he was exposed to them or which ones he found material").

9       Further, Plaintiff fails to allege when the allegedly fraudulent assurances occurred, when

10   she relied on them, or at what point they became false. In short, there are no allegations in the

11   Complaint from which the Court may reasonably infer that Twitter knew its "assurances" were

12   false when made. *See*, *Wessa v. Watermark Paddlesports, Inc.*, No. C06-5156 FDB, 2006 WL

13   1418906, at *3 (W.D. Wash. May 22, 2006) ("Plaintiff must set forth, as part of the

14   circumstances constituting fraud, an explanation as to why the disputed statement was untrue or

15   misleading when made.").

16       In sum, Plaintiff's conclusory allegations that Twitter used fraudulent, deceptive, and/or

17   false means to obtain her telephone number are insufficient, standing alone, to state a claim

18   under Section 140(1)(b). This failure requires dismissal of her Section 140(1)(b) claim under

19   Rule 9. *See Vess*, 317 F.3d at 1107.[13]

20

21   ─────────────────

22   [13] "If insufficiently pled averments of fraud are disregarded, as they must be, in a complaint or
     claim grounded in fraud, there is effectively nothing left of the complaint. In that event, a motion
     to dismiss under Rule 12(b)(6) would obviously be granted. Because a dismissal of a complaint
23   or claim grounded in fraud for failure to comply with Rule 9(b) has the same consequence as a
     dismissal under Rule 12(b)(6), dismissals under the two rules are treated in the same manner."
     *Vess*, at 1107.

REPORT AND RECOMMENDATION - 22

CONCLUSION

Because no amendment can cure the fundamental flaw that the alleged conduct does not fall within RCW 9.26A.140, the undersigned recommends that the Complaint be dismissed with prejudice.

OBJECTIONS AND APPEAL

This Report and Recommendation is not an appealable order. Therefore, a notice of appeal seeking review in the Court of Appeals for the Ninth Circuit should not be filed until the assigned District Judge enters a judgment in the case.

Objections, however, may be filed and served upon all parties no later than **March 31, 2021**. The Clerk should note the matter for **April 2, 2021**, as ready for the District Judge's consideration if no objection is filed. If objections are filed, any response is due within 14 days after being served with the objections. A party filing an objection must note the matter for the Court's consideration 14 days from the date the objection is filed and served. The matter will then be ready for the Court's consideration on the date the response is due. Objections and responses shall not exceed five (5) pages. The failure to timely object may affect the right to appeal.

DATED this 17th day of March, 2021.

BRIAN A. TSUCHIDA
Chief United States Magistrate Judge

REPORT AND RECOMMENDATION - 23